Devin James Maravel v. Kilolo Kijakazi Mr. Kijakazi, Mr. Palletta. Mr. Palletta, good to have you. Good morning, your honors. My name is David Palletta. I represent the appellant Devin Maravel. This is a mental impairment case. Mr. Maravel contends that he meets listings 12.04, 12.10, 12.15. The ALJ acknowledged Mr. Maravel has severe impairments, but ruled that his condition had improved sufficiently to enable him to work. In oral argument, I will address three points, that no recent medical hospitalizations does not mean improvement, that the ALJ failed to consider the entire record, and that the district court was overly deferential.  It is important to understand his medical history. Between the ages of 8 and 14, he was hospitalized six times for suicidal, homicidal, and psychotic behavior. Between the ages of 11 and 16, he was placed in multiple group homes for many months. And while hospitalized and while in group homes, he was abused and traumatized. So by the age of 17, he had been given nine different psychiatric diagnoses, ADHD, Asperger's, bipolar disorder, mood disorder, pervasive developmental disorder, PTSD, schizoaffective disorder, and Tourette's syndrome. Now, I don't argue that he has all of these conditions today. Rather, the number of these diagnoses reveals the severity and the complexity of his mental illness. The ALJ found mental illness, but citing no recent hospitalization four times, deemed that he had gotten better, at least enough to work. This conclusion was wrong for six reasons. First, listing 12 has no requirement of recent hospitalizations. Two, the North Carolina statutory standard for in- Do you contend that that's all the district court was relying on? I mean, we're looking at substantial evidence, and it strikes me that that's a piece of the story. But at least my reading of the ALJ's work was, he didn't say it's only because he hasn't been recently hospitalized that I reached this decision. Isn't that fair? Well, I think that the ALJ certainly relied heavily on that, but we see this court as having several issues to review. Ann, I'm about to address what the ALJ relied on. Well, one of the things that you keep talking about, at least in your papers, is that there was no consideration of the turning point records. Yes. Is that an error? Were those medical records? Didn't they well precede the time in which he would be getting benefits? They, well, his medical history is long, and those records were from the age of 16, and- Until? They were during the age of 16. They stopped him. He did stop Turning Point at age 18. Right. But no, that is- Turning Point's a group home? What is it? Turning Point is a program for students with mental impairments. It's like a special school. Special school for students with mental impairments? Yes. And his mental impairments were those ones you listed there a moment ago, including Asperger's? Yes, and others. And it has trained specialists- Asperger's is related to autism? Correct. You can assume, but I don't understand these medical terms. As a matter of fact, I don't understand most of these statutories. I think you can make that broad assumption for more than just one of us. Okay. So Asperger's is now considered part of the autism spectrum disorder. Yes. And if I may, I would like to respond to Judge Motz. I think you should respond to Judge Motz, and I'm sorry to have interrupted. Absolutely, you should. So what's very important, Your Honor, is that after Mr. Merrillville turned 18 in September of 2016, eight months later his grandmother and neighbor took him to see Dr. Berkhold because he was sleeping 20 hours a day, he was binge eating, and his mother was going back to rehab. Mr. Merrillville told Dr. Berkhold that he felt like he was going to die. Dr. Berkhold sent him to psychiatrist Miller. This is April and May of 2017, after the claim was filed. He told Dr. Miller that he was depressed, that he was hopeless, and he was in constant pain. Dr. Miller, the psychiatrist, assessed him to be at chronic high risk for self-harm, suicide, and violence. This is after he turned 18, after he filed his claim. Yet the ALJ does not mention these records from Dr. Berkhold and Dr. Miller that pull together all of the records. So we're not just relying on the records prior to 18, we're relying on those records. Though the other point to address your question is, he dropped out of therapy at age 17. So there aren't many records after that. The reason he dropped out of therapy is because he was abused and traumatized by mental health professionals who were supposed to help him. And he testified he doesn't trust these individuals, and the treatment he received was the most humiliating that he received in his life. So rather than assuming medical improvement, which, by the way, when the judge wrote medical improvement, that means he used to be worse. She found he had gotten better. And rather than assume that it's because he wasn't hospitalized, a simpler explanation is that he had a history of abuse, he didn't trust mental health professionals, and he had learned it was better to suffer in silence than to seek treatment. But when you say that, assume I even agreed with you. We review for substantial evidence. And so if there are two different inferences that we could draw, you want to say he doesn't want to be around mental health professionals. The ALJ reached the other conclusion. The question is, is it substantial evidence, right? We're not doing it afresh, right? I'm glad you asked that question, Your Honor. I am not arguing for this court to reweigh the evidence. But the ALJ found. That's what it sounded like, when you're like, oh, there's this evidence. He doesn't go back. I want you to infer from that that he's afraid or traumatized by mental health professionals. Somebody else, the ALJ, drew a different conclusion from that. I'm not sure which of those inferences is better, right? I certainly understand your argument on the point. But it seems like to me that's the weighing of the evidence, the inference to be drawn from the lack of hospitalization. There are two plausible reasons that you've given, right? The ALJ chose one. What are we doing? I'm glad you asked that question, Your Honor, because we are not asking for a reweighing of the evidence. And also, we acknowledge the burden of proof is on Mr. Marable. So what are you asking for? You don't want us to reweigh the evidence. What do you want? Four issues. One, because the ALJ found mental illness, found four severe impairments, and found medical improvement, the issues this case raises are, did the ALJ consider the entire record? We submit no. I'm prepared to explain why. Two, did the ALJ add a requirement to Listing 12 that is not in Listing 12? And that requirement being recent hospitalizations. Did the ALJ do a function-by-function review in RFC? That's required by the Mascio case in SSR 86-AP. There is no function-by-function review of mental limitations. And lastly, was the bridge that the ALJ built logical? And that's for you to consider. Those are legitimate appellate issues. Did they consider the entire evidence? Did they follow the rules? And those centrally are the issues of this case. Well, does the ALJ have to expressly consider every piece of evidence? Is that your position? No. I'm trying to figure it out. Help me. Sure. There's no per se rule. However, as the Court said in Thomas, there is no per se rule, but the ALJ cannot regard tremendous evidence to the contrary. For example, the turning point records are relevant. The turning point records address all of the 12B criteria. They cannot be ignored. And three sentences in the decision address the turning point records. The ALJ spent more time on a one-time. Only three? The problem is the ALJ only spent three sentences on those records? Doesn't that give us some indication that he considered them? Well, there's a difference between, this is for your honors to decide, there's a difference between mentioning evidence and discussing evidence. And the line of cases from Radford, Mascio, and Monroe, what happened in all of those cases is the ALJ did not adequately explain the decision so that this Court could do a meaningful review. And so our argument is there was an inadequate explanation of how, for example, Thomas requires evidence, a logical explanation, and conclusions. The logical explanation is what is missing here. She mentions evidence. In fact, it's the new technique of ALJs. They just go down the exhibit list and they mention it all. But here, for this Court to review, there must be a discussion of the logic. And so I ‑‑ Well, if you look at step three, which you would say is deficient, right? Yes. You come to a conclusion, but you don't give the rationale for it. So there is more rationale in the step four discussion. Are we not allowed to consider that when we look at step three? Well, the opposing counsel says the answer is yes. Well, I'm asking you. And relies on the Keene case. That case was not published and is not binding. The Radford case is on point. Radford was a step three case. And what the Radford Court said was that the ALJ must ‑‑ this is specifically in Radford. It's on point. The ALJ must explain their decision sufficiently for there to be meaningful review. But I'm not sure that meets exactly my question. So if we should find that step four did explain the conclusions that are reached in step three, do we avoid step four and say, no, you have to have all this stuff in step three? Well, the case law does not support that ruling. Because the case ‑‑ So the case law says you cannot look at the step four. You have to look at only the rationale given in step three. No. I'm just trying to get the answer. There is no per se rule. So it doesn't say you cannot do this or you cannot do that. And we're not arguing per se rule. What it says, most of the cases out there are step four and five cases. There aren't many step three cases. This is primarily a step three case. Well, Radford was a step three case. It is directly on point. The argument made by counsel in Radford was you look at the whole decision. That was also the argument made by counsel in the Woods case. Woods argued, the commissioner argued, look at the whole decision. And this court said in Woods, no, you look, the ALJ must identify the evidence relied upon and then must build an accurate and logical bridge. So the question for this court is did the ALJ build an accurate and logical bridge from the evidence to her conclusions? If you find that, then you rule for the commissioner. We submit that that logical bridge is missing. So you want us to remand it to the ALJ for more work? Yes, we are seeking a remand. You're not asking us to award benefits or anything? No, Your Honor, I don't think the facts support that. You're just going to say they didn't do it right? Correct. They did it this time around and they need to do more. Correct. They must explain the reasoning. They must, I don't want to. You would say we need to remand it to the district court and tell the district court it needs to be remanded to the commissioner, the ALJ for more work. That is correct and that is. Right under the procedures and consider the things, logical bridge if they're going to. We're giving benefits. That is the relief sought. If he gets benefits, he's not a child anymore, what's the effect of it? Well, he filed two claims. One is supplemental SSI claim. That's basically a welfare type of disability for poor people. That's claim one. The second claim is under social security, you can file benefits if you become disabled prior to the age of 22. If your parent is deceased. He's not under 22 anymore. He was 20 at the time of the hearing. He's about 22 now. So he must prove disability prior to the age of 22. And that's why the records from Dr. Berkholdt and Dr. Insight. Well, if he proves he's disabled prior to 22, he can get the child benefits. Then he draws disability under his deceased father's work record or his disabled mother's work record. He gets benefits until he's 22 or to get the rest of his life? He gets them until the point he becomes not disabled. He gets them as long as he continues to be disabled. Correct. But this program is only available to adult children after he turns 22. It's no longer available. I'm just trying to understand the basics of this. It sounds like a brief. So, a couple of main points. One is that the records from April and May of 2017 are very important because they're after he turned 18. The psychiatrist found severe mental health symptoms. They indicate that the severity of the symptoms that's shown in the prior records is ongoing. And the ALJ did not mention these records. We would submit that that's error in and of itself because the case law says the ALJ must explain contrary evidence. These are the most important records in the file, and they are not mentioned anywhere in the decision. I know you're out of time, but on your reply, I don't need it now. The Burkholz and Miller records, when I see your argument about the ALJ failed to consider the entire record, I don't see any mention of those records. And so when you come back up on reply, I'd love for you to show me where you've made that argument. Sure. Thank you. Mr. Somers? Do you represent the commissioner? Yes, Your Honor. Thank you. Good morning. May it please the Court. Good to have you with us. Thank you. You're a special assistant United States attorney? Yes. That means you actually work for the Social Security Administration. Yes. I designate you as a special assistant for the purpose of handling this case. Yes. The military of North Carolina appointed me as a special assistant United States attorney to handle this case. Good to have you here. Thank you very much. I'm arguing on behalf of the acting commissioner of Social Security. This case is not about minimizing Mr. Maribel's history or his mental health impairments. Because he applied for disability benefits after he turned 18 in September 2016, what Mr. Maribel's case was about before the ALJ was whether he had functional limitations that prevented him from entering the workforce as an adult. Zeroing in on that issue, the ALJ acknowledged Mr. Maribel's history, detailing the intensive mental health treatment he received as an adolescent and a younger teenager, and recognizing, quote, that he experienced significant traumatic events during childhood, end quote. What duty does the ALJ have to explain his decisions? The ALJ's obligation in explaining her findings in this case is to present her rationale in a statement of the case that shows how she got to her conclusions based on the evidence. And where does she do that? She does that in two places. So focusing on the arguments that are at issue here, which are the step three finding and then the residual functional capacity finding, the RFC finding. So at five to six, when doing the step three analysis, where the ALJ finds that Mr. Maribel does not have a marked level of limitation in any of the four. I'm sorry, you're looking at five to six of what? Oh, sorry. So I'm using the page pagination, which I think tracks with the joint appendix, or it's page 19 of the transcript. Got it. You have the transcript site. So on that page we have the ALJ's making those findings and provides sort of a general overview of the evidence. There's really three main lines of evidence that the ALJ is relying on here. She's relying on the treatment records, which show that as an adult, Mr. Maribel was in a much better place, one where we could expect him to enter the workforce. Unlike, and this addresses one of counsel's points, unlike when he was younger, when he was presented with situational stressors as an adult, he doesn't require the same intensive inpatient treatment that he required when he was younger. And so the ALJ on that page is citing to the fact that, for example, that he seems to respond well to medications. And that actually comes directly from the psychiatric records that counsel had cited to in May 2017. In May 2017, counsel reports to Dr. Miller that he thinks his medications are working well for him, and he was feeling more hopeful. And that's after a period of significant situational stressors related to his mother, her mental health issues, and her sobriety. And he comes out of that saying that his medications are working well, and he doesn't require the same kind of inpatient treatment that he required previously. So the ALJ is citing to that there, and the ALJ is also citing to evidence there regarding, and also on that point I would point out that after May 2017, the treatment modality that he's receiving is he goes to his primary care doctor, he receives a medication regimen, and he's generally reporting that he's doing pretty good. So then we have that treatment, that line of evidence, that treatment record. You can see that the ALJ is considering that at page five to six when she's citing to that evidence. And then also on that page she's citing to. I guess maybe I'm expecting too much, and maybe you look at a lot of these. She states these facts. I don't see her making, you know, balancing one thing against the other and saying X, you know, one, two, and therefore three. I just see one and two put down. Do you understand what I'm saying? Yes. So she's saying here that she's rating Mr. Maribel on the five-point scale in terms of the various categories at the various levels, and that she's providing an overview of the evidence that she's considered when she made that assessment. And so what she's doing there is explaining why the overall rating hits no or moderate or mild in those levels, and that's relying on that evidence there. And that's made in the context of the ALJ then going on, as Your Honor had mentioned, before the step four assessment when making the RFC finding, the ALJ goes through the evidence in greater detail and ends with a summary on page 24 to 25 where the ALJ is sort of explaining her overall view of the evidence, which is that as an adult, Mr. Maribel is in a better place. He can handle this range of work that addresses his limitations. It's not that the ALJ found that Mr. Maribel could perform any type of work. Mr. Maribel has 109 IQ. He has average cognitive functioning, and the ALJ recognizes that he could perform work involving complex tasks, but owing to the fact that he has these mental health symptoms, and they're still there. They're present. He worked for a week with them. Yes. He attempted to work the counter at Five Guys. Five Guys for a week. A hamburger restaurant. Is that the extent of his work history? I believe so, yes. That is the extent of his work history, but his testimony is 22 years old. At the time of the ALJ's decision, he's around 20, and so he testifies that the reason why he struggled at Five Guys is that there was the constant customer interaction and having to keep up with taking customers, relaying the orders to his coworkers. That was the problem. And that's not a feature of what the ALJ finds him capable of. The ALJ limits him to work where there's no contact with the public and only occasional interaction with coworkers. The jobs that are eventually cited at Step 5 are housekeeper, routing clerk, marker. That's like a price marker at a retail store, a router is somebody who sorts boxes at a mailing facility. And a housekeeper is a housekeeper. The ALJ is keyed in on the type of limitations that Mr. Maribel had and is addressing that through her findings. There's three lines of evidence that I was talking about. The first was the treatment records where he went through. As I pointed out, I think those treatment records from April and May of 2017 support the ALJ's analysis. The ALJ discusses them on 20 pages. The ALJ never mentions the turning point records, right? No, the ALJ does mention the turning point records, does discuss them, a page, I believe. They're the fullest set of records. Yes. They're the fullest set of records. There is a long period and very detailed and helpful to the claimant records from the turning point people. Yes. And they certainly don't get that attention from the ALJ. The ALJ gives them attention. Those records are certainly relevant. They tell the story. They're the preamble, so to speak, of how we're going to look at Mr. Maribel as an adult. And where does the ALJ say that? That's what the ALJ's decision conveys. To address sort of the general duties of an ALJ, I think the standard is that an ALJ's discussion needs to provide enough analysis for the rationale to be reasonably discernible. So we need to be able to understand, as we read the whole decision, whether or not the ALJ considered the evidence and made a reasonable conclusion, whether or not we can perform substantial evidence review. So what were the reasons that the ALJ? If we know what the reasons the ALJ found, then we can look through the record and see whether or not the ALJ was relying on evidence that a reasonable mind might accept as adequate, which is what the substantial evidence standard is. So another way of asking that is the turning point records, I understand it's like 123 days of treatment. So he's only there for a relatively short period of time. The conclusions in those records are consistent with what the ALJ described as this individual's problems when he was 14, 15, 16. Yes. I'm just trying to understand precisely what you're saying. This was this little slice of information. It's consistent with what the ALJ described, and that's how we discern that there's nothing that wasn't properly considered. Yes, we can discern that the ALJ looked at those records, considered them, and then when we see that the ALJ is talking about how as an adult Mr. Marivelle is in a different place, when the ALJ is focusing on the evidence regarding him responding well to medications, regarding his reports about his activities, and Mr. Marivelle testified to playing involved computer games and studying history, and those weren't fleeting activities. He reported doing those for hours at a time during the day. And he also, in terms of social functioning, which was an issue for him, he did report difficulty making friends, but also he had friends. He reported social gatherings as one of his hobbies. He went to an outing the day before his disability hearing where he went and visited friends that he had not seen in a while. And so that line of evidence is also something the ALJ marshals here to lead to this conclusion. Can you respond, at least as I understood it, and maybe I misunderstood it, which is entirely fair. Your colleague suggested that the Burkholtz and Miller records were not mentioned by the ALJ. Can you respond to that argument? They're mentioned by the ALJ. The ALJ cites to the UNC Health Care Records. He doesn't identify the doctors by name, but he cites the UNC Health Care Records from May 2017, Exhibit 6F on page 24 of the decision. So the ALJ is considering that. And that is the Burkholtz and Miller? Yeah, that is the Burkholtz. Burkholtz is Mr. Maribel's primary care provider. And in April of 2017, she sends him to his— because he's having these situational stressors and he's struggling. That's when he reports, for example, 20 hours of sleeping. And so she sends him to Dr. Miller. Dr. Miller examines, sees him twice, examines him. Notably, those mental status examinations suggest that he's able to fully attend and concentrate. He's not exhibiting any concerning behaviors. They're fairly benign. And then after that, we have just continued treatment with Dr. Burkholtz. He doesn't go back to Dr. Miller again after that. And also, in terms of the sleeping, that 20-hour sleeping complaint there, that's not pervasive throughout the record after May 2017. In 2018, he says his sleep quality is okay. That's at 1495, for the record. He's sleeping without disruption for about 10 hours. Later that year, that's at 1501. And, in fact, Dr. Burkholtz actually takes away— or actually, like, titrates him down on his sleep aid, Clonidine, in 2018. She does what? Titrates it down. So she, like, lowers the dosage and eventually takes that medication off because he doesn't need it. So I think that you are pretty successfully demonstrating, at least to me, that there is evidence in this record to support what the ALJ did. And what I'm trying to figure out is if the ALJ has given us enough explanation because I think that that's the essential argument that your colleague on the other side is making. And supporting your case is it seems like this is an exercise in futility if we would send this back if we thought there was sufficient evidence in the record if the explanation met at least a minimum bar. But as I read the case law, if it doesn't, then we do have to send it back, even though it may be an exercise in futility. Is that correct? I wouldn't say that. I think the case law is pretty clear that the ALJ has to give a reasoned explanation of the conclusions that he or she reaches so that we can understand it. Yes, I would agree with that. I would say that if the ALJ doesn't provide a rationale that is reasonably discernible, then that would inhibit the ability to perform the substantial evidence review. But here we have that. And the third line of evidence that I haven't gotten to yet is the expert evidence here. And I think that's very significant here is that there's no medical opinion proposing that Mr. Mariveles is markedly limited or that he has any greater limitations than assessed by the ALJ. And the ALJ gives great weight to Dr. Knowles, who's a highly qualified expert in disability adjudication. And Dr. Knowles looks at his treatment records through September of 2017, including the Bergdorf and Miller records that we just discussed. And Dr. Knowles assesses that he has a moderate limitation, no more than a moderate limitation in any of the relevant categories, and that he can handle a range of simple work. And the ALJ gives great weight to that assessment. So there are a bunch of experts, right? There's three, yes. Yes. And one of the experts. Three on mental, sorry. I don't understand what you just said. I thought there were more than three. But in any event, I thought that one or two of the experts never saw him, just studied his records. Not true? So Dr. Knowles, Dr. Saad and Dr. Knowles, they are the state agency consultants. They review the record. Right. But they never examined him. No, they never examined him, but they review his medical records. But the person who did examine him, they relied on the records created by that person, right? Yes. And didn't the ALJ find that that person was not credible? They didn't find that that person was not credible. They found that the limitations were vague in the sense that they didn't give a specific assessment. Well, she rejected. The person who saw him's opinion, she rejected. Rejected. Is the ALJ a male or a female? She's a she. She, I thought it was. I started calling her him. Okay. No, the ALJ does not, I mean, the ALJ doesn't reject the consultative examiners, whose name is for some reason escaping me, does not reject her report. What the ALJ explains is that it was vague in the degree of limitations, but it's also largely consistent with her findings. So the ALJ finds at 25, when addressing, you know, she gives partial weight to the consultative examination and exhibits that. And that consultative examiner is the one who assesses 109 IQ, is the one who assesses that he's able to handle simple tasks and attend to simple instructions. And she assesses social awkwardness and some difficulty in terms of interacting with others. Who is Dr. Derringer? So Dr. Derringer is the physical. So that's why I was, I said three instead of four. I see I'm out of time. I don't want, okay. Dr. Derringer is the physical examiner. So he is, that's what I was trying to say. So there's no challenge. So he's the person that actually did see the man. And the other people just read records. I mean, that seems odd. So the reason why the ALJ doesn't give that specific weight to there is because of the lack of a specific functional assessment, which is like the most helpful thing. But the ALJ does consider that exam. And I'll point out that that's not that exam. It relates to his physical functioning. And as counsel indicated, this case is at the appellate level now is about his mental functioning and not, you know, there's no argument here that the ALJ made any errors in terms of assessing a light work finding in terms of his physical capabilities. Excuse me. Would you answer questions as long as you get them? Yeah, sorry. So if I could just sum up, I would just say that the ALJ here did provide a valid explanation. There's enough discussion in this where the ALJ is citing to the fact that he's responding well to medications and his treatment records as an adult, his activities that he was performing as an adult, and then Dr. Knowles' assessment and the other medical opinions do support the ALJ's assessment. So for that reason, we'd ask that we defer to the ALJ's decision. Mr. Pauletta? Responding to Judge Richardson's question, I argue at three places in my brief that Dr. Buerkle and Miller records were not considered. The first place is the first full paragraph at page 5. The second place is the first paragraph on page 32. I'm sorry, let me go back. Page 5 is the fact section, right? Yes. Tell me, what's the argument that you're making that they didn't consider the record? I'm happy to just go back and look at it, but when I just skim what you're saying there, that doesn't include anything to me that the ALJ failed to consider Buerkle's records, right? It describes Buerkle's records, but it doesn't say the ALJ made an error. The ALJ never mentions Dr. Buerkle records from April of 2017. Show me where you say that in your brief is what I'm trying to get. I mean, that's totally fine. When you said it in argument, that was not an issue that I was familiar with. And it may well be that I just missed it. But what I'm trying to find is where do you say that in your brief, not where do you talk about Dr. Buerkle. You see what I'm saying? Because when you make the argument on page 20 and 21, the ALJ failed to consider the entire record. You talk about the turning point records, and Judge Mott's asked you about those. But then when you stood up to argue, you said, no, there are these other records that they failed to consider. Page 39, top. I say, and this I'm talking about the district court error because I needed to address that. And I say, first, I've already mentioned these records twice. And here I say, however, page 39, the district court does not address the failure of the ALJ to discuss UNC health records. The document, Mr. Merrillville experienced very severe symptoms. And your argument is that sentence preserves the separate argument that the ALJ made the error that you're sort of using as the premise. So what you're saying is the district court erred, and that, in your view, preserves the argument that the ALJ erred. Well, I argue, I've always argued that ALJ did not consider all of the evidence. That's, didn't consider the entire record. And I don't want to belabor this, but the only, when you do that, that's fine. You made that argument very clearly at page 20 of your brief. But the only thing you cite to, right, are these, you know, the teach report and the turning point records. Yes. And on page 39, I say the district court let the judge not discuss that. And so I feel I made that argument, but your honor's the judge and I'm not. The opposing counsel cite statements by Mr. Merrillville, such as he has friends and he had seen them shortly, indicating he's not severely disabled today. ALJ did the same thing. In Mascio, the ALJ did the same thing. And this court ruled that when the ALJ cites statements by the claimant, the ALJ must explain how she decided what to believe and what not to believe. And so in this case, the ALJ cited some statements, disregarded all of the statements indicating severe impairment. For example, within minutes after Mr. Merrillville testified that he socialized somewhat, he discussed the voices he hears in his head that say horrible things, so horrible he would not discuss them, and that are totally distracting and upsetting. That wasn't mentioned by the ALJ. So the ALJ looked at one part of the record and did not explain how she decided what to believe and what not to believe. Well, I think the latter of what she said is true, or may be true, but I'm not sure that you're right about what you said at the beginning. Because if you look at page 24, she says, after careful consideration of the evidence, the undersigned finds that the claimant's medically determinative impairments could reasonably be expected to cause the alleged symptoms. However, the claimant's statements concerning the intensity, persistence, and limiting effects of those symptoms are not entirely consistent with the medical evidence and other evidence in the record. Yes. She is explaining what she is accrediting. That is her conclusion. And what I have argued is she leaves out the logical explanation that connects the evidence to that conclusion. Further, I don't want to, since I got so many questions the first time around, I don't want to leave out, there's no function-by-function review of the mental limitations. Mascio et al. require the ALJ to do a function-by-function review first. The ALJ did not do that. She did the residual functional capacity expression first. That's an error of law. I cite it in my brief. That's another. So we don't want the court to re-weigh the evidence, but we want the court to hold the ALJ. She makes this argument in your brief? Yes. Function-by-function review? There's no. The function-by-function review came after the expression of the RFC in violation of Mascio. I think I'm out of time. But any further questions? We appreciate it very much, Mr. Paleto. Thank you for your consideration. I look forward to this case and you as well.
judges: Robert B. King, Julius N. Richardson, Diana Gribbon Motz